ORANGE COUNTY, SENSIBLE HIGHWAYS AND PROTECTED EN-
VIRONMENTS, INC. (SHAPE), DARRELL DAWSON, ROSA ANN
DAWSON, CURTIS R. BOOKER, MARY M. BOOKER, MAURICE A.
LESAGE, ROWLAND E. FULLILOVE, CHARLES W. JOHNSTON,
CAROLYN C. JOHNSTON, GERALD M. WOMBLE, KARLEEN S. WOM-
BLE, APPELLANTS v. NORTH CAROLINA DEPARTMENT OF TRANSPOR-
TATION, NORTH CAROLINA BOARD OF TRANSPORTATION, THOMAS
W. BRADSHAW, JR., INDIVIDUALLY, AS SECRETARY OF THE NORTH CAROLINA
DEPARTMENT OF TRANSPORTATION, AND AS CHAIRMAN OF THE NORTH CAROLINA
BOARD OF TRANSPORTATION, T. L. WATERS, INDIVIDUALLY, AND AS MANAGER OF
PLANNING AND RESEARCH, NORTH CAROLINA DEPARTMENT OF TRANSPORTATION,
BILLY ROSE, INDIVIDUALLY, AND AS ADMINISTRATOR, DIVISION OF HIGHWAYS,
NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, MARC BASNIGHT, JACK
E. BRYANT, DAVID W. BUMGARDNER, JR., JOHN QUINCY BURNETTE,
JEANETTE D. CARL, ILEY L. DEAN, MICHAEL B. FLEMING, JOHN K.
GALLAHER, GARLAND B. GARRETT, JR., JAMES B. GARRISON, JOHN
M. GILKEY, GEORGE G. HARPER, WILLIAM C. HERRING, MARTHA C.
HOLLERS, DAVID W. HOYLE, CHARLES R. JONAS, JR., T. G. JOYNER,
OSCAR LEDFORD, HELEN H. LITTLE, MARVIN R. PHILLIPS, MOSES A.
RAY, JOSEPH E. THOMAS, ARTHUR WILLIAMSON, ALL INDIVIDUALLY,
AND AS MEMBERS OF THE NORTH CAROLINA BOARD OF TRANSPORTATION, AP-
PELLEES

No. 7910SC522

(Filed 6 May 1980)

1. **Administrative Law § 4; Highways and Cartways § 1; State § 1— government action—environmental impact**

It is the policy of this State and the Federal Government that en-
vironmental impacts be considered before major governmental actions involv-
ing the expenditure of public funds are taken; nonetheless, once these
environmental factors are properly taken into consideration, pursuant to
prescribed procedures, governmental agencies may effect the completion of a
proposed project notwithstanding the fact that adverse environmental conse-
quences may occur.

2. **Administrative Law § 8— review of agency decision—environmental conse-
quences**

A court may review the manner in which an agency decision has been
made to ensure that environmental consequences have been considered in the
manner prescribed by law.

3. **Administrative Law § 5; Highways and Cartways § 1— location of highway—
decision of State Board of Transportation—plaintiffs as aggrieved parties**

Plaintiffs were all "aggrieved" by a decision of the State Board of
Transportation on the location of an interstate highway within the meaning of
G.S. 150A-43 where the individual plaintiffs are property owners within the
proposed corridor of the highway, the members of plaintiff nonprofit corpora-
tion are citizens and taxpayers who live in or near the proposed corridor, and

plaintiff county's tax base and planning jurisdiction will be affected by the proposed highway. Furthermore, the individual plaintiffs as taxpayers are "aggrieved" persons under G.S. 150A-43.

4. **Administrative Law § 5; Highways and Cartways § 1— failure of agency to prepare environmental impact statement—procedural injury—aggrieved party**

The "procedural injury" implicit in the failure of an agency to prepare an environmental impact statement is itself a sufficient "injury in fact" to support standing as an "aggrieved party" under G.S. 150A-43 as long as such injury is alleged by a plaintiff having sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have.

5. **Administrative Law § 5; Constitutional Law § 7.1— unconstitutional delegation of legislative power—no judicial review of agency decision**

Plaintiffs cannot obtain judicial review under G.S. 150A-43 of their claim that G.S. 143B-350(f)(8) unconstitutionally delegates legislative power to the State Board of Transportation since the claim involves no agency "decision," but such claim may be heard pursuant to Art. IV, § 1 of the N.C. Constitution.

6. **Administrative Law § 5; Highways and Cartways § 1— denial of hearing to plaintiffs—final agency decision—judicial review**

A decision by the State Board of Transportation to deny plaintiffs a hearing before the Board concerning the location of an interstate highway was a "final" decision within the meaning of G.S. 150A-43 since the decision affected a right which plaintiffs had pursuant to the Board's own administrative regulations.

7. **Administrative Law § 5; Highways and Cartways § 1— federal-aid highway— adequacy of environmental impact statement—judicial review—necessity for federal location approval**

Appellants cannot obtain judicial review under G.S. 150A-43 of a claim pertaining to the inadequacy of the environmental impact statement for a proposed federal-aid highway under either federal statutes or the N.C. Environmental Protection Act unless they show that the State Department of Transportation has requested and received location approval for the highway from the Federal Highway Administration.

8. **Administrative Law § 5; Highways and Cartways § 1— location of interstate highway—N.C. Environmental Protection Act involved—contested case**

The decision of the State Board of Transportation as to the location of an interstate highway constitutes a "contested case" within the meaning of G.S. 150A-43 where the North Carolina Environmental Protection Act is involved.

9. **Administrative Law § 5; Highways and Cartways § 1— right to petition State Board of Transportation—exhaustion of administrative remedies—substantial compliance**

Appellants complied with the substance of the right of petition to the State Board of Transportation through the county commissioners given by G.S. 136-62 concerning the location of a highway when they joined with Orange

County to present their grievances to the Board and subsequently to bring
this lawsuit.

10. **Administrative Law § 5; Highways and Cartways § 1— location and environmental impact of highway—failure to appeal to hearing officer—administrative regulations not readily available—judicial review**

Appellants' failure to exhaust their administrative remedy of appeal to a
hearing officer appointed by the Governor did not bar judicial review of a deci-
sion of the State Board of Transportation concerning the location and en-
vironmental impact of a proposed highway since the administrative remedy
prescribed by environmental regulations is inadequate because (1) the ad-
ministrative regulations have not been published as required by G.S. 150A-63;
(2) over 18,000 pages of regulations exist; (3) anyone seeking the regulations
would have to sift through the files of regulations in the Attorney General's
Office in Raleigh; (4) the regulations which have been officially codified are not
indexed by the corresponding statutory reference; and (5) even the most
skilled attorney would at best have only a random chance of discovering the
existence or absence of the regulations for which he is looking.

11. **Highways and Cartways § 9; State § 4.3— sovereign immunity—action against State Board of Transportation**

The doctrine of sovereign immunity did not bar plaintiff's action against
the State Board of Transportation alleging that the Board made a decision as
to the location of the route for an interstate highway in an unlawful manner
since the doctrine of sovereign immunity does not bar an action (1) when public
officers invade or threaten to invade the personal or property rights of a
citizen in disregard of law or (2) when plaintiffs assert their status as tax-
payers to prevent the expenditure of money unauthorized by statute or in
disregard of law.

12. **Constitutional Law § 7.1; Highways and Cartways § 1— authority of Department and Board of Transportation to plan highways—no unlawful delegation of legislative authority**

The delegation of the authority to the N.C. Department of Transportation
and the Board of Transportation to plan and construct an interstate highway
did not constitute an unlawful delegation of legislative authority to an ad-
ministrative body which was unrestrained by legislative standards or sufficient
procedural safeguards or political accountability in violation of Art. I, § 6 and
Art. II, § 1 of the N.C. Constitution.

13. **Highways and Cartways § 9— action to enjoin Department and Board of Transportation—denial of hearing—federal and Board regulations—claim for relief**

Plaintiffs stated claims under federal regulations to enjoin the Depart-
ment of Transportation and Board of Transportation from taking further ac-
tion on plans for an interstate highway without observing the statutory and
constitutional rights of plaintiffs based on (1) denial of a right to be heard by
the Board or other hearing officer in the area affected by the highway con-
struction project and (2) inadequate public notice of the highway corridor
meetings held by the Board of Transportation and the Department of

Orange County v. Dept. of Transportation

Transportation. Furthermore, plaintiffs stated a claim for injunctive relief based on failure of the Board to grant them a hearing in violation of the Board's regulation in effect at the time plaintiffs sought to be heard which stated that "any person having business with the Board of Transportation *shall* be heard by the Board."

**14. Highways and Cartways § 9— location of federal-aid highway—no final environmental impact statement—no claim for injunctive relief against Board of Transportation**

Plaintiffs' contention that a final environmental impact statement had not been prepared prior to a decision by the Board of Transportation as to the location of a proposed federal-aid highway stated no claim for injunctive relief against the Board since federal regulations require that the state highway agency select a highway corridor based on the draft environmental impact statement, and a final statement is not required until federal location approval has been obtained.

**15. Highways and Cartways § 9— inadequacy of environmental impact statement—claim for injunctive relief against Board of Transportation**

The appellate court cannot say as a matter of law that plaintiffs have failed to state a claim for injunctive relief against the State Board of Transportation concerning its decision as to the location of an interstate highway based on plaintiffs' allegation that the environmental impact statement relied on by the Board was materially misleading in that it presented two alternative routes which were not real alternatives since they were going to be built regardless of the route selected for the interstate highway.

**16. Injunctions § 3; Mandamus § 3.1; Public Officers § 8— public officers—in personam orders requiring performance of ministerial duties**

The courts of this State have the power, pursuant to Art. IV, § 1 of the N.C. Constitution, to issue *in personam* orders requiring public officials to act in compliance with their ministerial or nondiscretionary public duties, and it makes no practical difference whether such orders are called writs of mandamus or preliminary injunctions.

**17. Highways and Cartways § 9; Injunctions § 3— State Board of Transportation— hearing, notice, environmental impact statement—mandatory injunction**

While the duty to decide where a highway corridor will be located is a discretionary duty for which no mandatory injunction will lie against the Secretary of Transportation, the Manager of the Planning and Research Branch of the Department of Transportation, the Administrator of the Division of Highways, and members of the Board of Transportation in their individual capacities, the duties of such officials to hear the plaintiffs, to provide notice, and to provide an environmental impact statement are ministerial duties which can be enforced by a mandatory injunction.

APPEAL by plaintiffs from *Braswell, Judge.* Order entered 1 March 1979 in Superior Court, WAKE County. Heard in the Court of Appeals 11 January 1980.

The plaintiffs fall into three categories. In the first category are three local units of government: Orange County, the Town of Chapel Hill, and the Town of Carrboro. Of these, only Orange County is an appellant herein. The second category includes the Dawsons, the Bookers and the Wombles who are citizens, taxpayers and residents of Durham County, and Fullilove, Lesage, and the Johnstons, who are all citizens, taxpayers, residents, and landowners in Orange County, all of whom would have land taken from them by the proposed highway project. The third category includes a North Carolina nonprofit corporation, Sensible Highways and Protected Environments, Inc. (SHAPE), some members of which would have lands, farms, homes and businesses taken for the right-of-way of the proposed project, and other members of which are citizens, taxpayers and residents of Orange and Durham Counties who live near the proposed project and who claim they would be adversely affected by it.

The defendant appellees are the North Carolina Department of Transportation (NCDOT), the Secretary of NCDOT, the NCDOT Manager of Planning and Research, the NCDOT Administrator of Highways, and the North Carolina Board of Transportation. With the exception of the NCDOT, all defendants are sued in their representative and individual capacities.

The appellants' complaint, filed 8 August 1978, seeks judicial review pursuant to G.S. § 150A-43 and further seeks temporary and permanent injunctive relief to restrain defendants from exceeding their constitutional and statutory authority in connection with the approval process for Interstate Route 40, from Interstate Route 85 west of Durham to Interstate Route 40 southeast of Durham in Durham and Orange Counties. The appellants contend that they are threatened with immediate and irreparable injury in the following manner:

"a) disruption of town and county planning for an orderly process of development of southern Orange County,

b) the permanent destruction of hundreds of acres of prime farmlands, woodlands and wildlife habitats,

c) increased levels of water, air and noise pollution,

d) the taking of the property, homes, farms and businesses of the members of SHAPE and many of the citizens and residents of Orange County,

e) injury to historical sites within and immediately adjacent to the 1-B corridor in southern Orange County,

f) the disruption of existing communities and social inter-course and patterns in the area,

g) increasing pressure on scarce community services such as water, sewer, fire and police protection that would be necessary to accommodate the expected increase in popula-tion caused by the highway project, and

h) the unnecessary expenditure of state and federal tax monies."

The appellants contend that defendant appellee North Carolina Board of Transportation and its individual members acted in an arbitrary and capricious manner and in violation of statutory and constitutional provisions when they formally ap-proved the construction of "Alternative 1-B" for Interstate Route 40 from Interstate Route 85 west of Durham through Orange County to Interstate Route 40 southeast of Durham. In particular, appellants assert (relevant to this appeal) that: (1) no final En-vironmental Impact Statement (EIS) had ever been prepared; (2) the Revised Draft Environmental Impact Statement of 5 May 1976 relied upon by the Board was materially misleading in that it presented "Alternatives 3 and 4" to Interstate Route 40 as alternative routes to Route 1-B when Alternatives 3 and 4 were already in various stages of planning and construction and would be built regardless of "Alternate 1-B"; (3) the delegation of the planning and construction of Interstate Route 40 to the North Carolina Department of Transportation was an unconstitutional delegation of legislative authority because there are no standards to guide administrative action and inadequate procedural safeguards to protect the rights of citizens; (4) the Board of Transportation denied appellants a right to be heard by the Board, including their right to be heard in the area of the State affected by the highway construction project and in so doing violated their own administrative rules; (5) the Board of Transpor-tation failed to make a transcript or keep adequate minutes of the

September 9, 1977 meeting; (6) the Board of Transportation was asked by the chairman to "concur" rather than to "decide" on Alternative 1-B; (7) no information developed by opponents to Alternative 1-B was presented to the Board until a few seconds before their approval vote; (8) there was no adequate public notice of the September 9 meeting of the Board; (9) the Board spent less than five minutes of debate on this $84 million dollar expenditure of public funds; and (10) the form of approval of Alternative 1-B was so vague and meaningless as to leave the Department of Transportation free to make whatever changes it may in its sole discretion deem necessary.

For these reasons the appellants seek a preliminary injunction against any further action by appellees on Alternative 1-B for Interstate 40 and seek a permanent injunction mandating that appellees observe the statutory and constitutional rights of appellants.

On 7 September 1978 appellees moved to dismiss pursuant to N.C. Rules Civ. Proc. 12(b)(1) and 12(b)(6). In their answer, filed 22 December 1978, the appellees deny any liability in their individual capacities and assert sovereign immunity with respect to their representative capacities. As a further answer and defense the appellees make the following assertions:

(1) For over nine years the North Carolina Department of Transportation and its predecessor agencies, the North Carolina State Highway Commission, the North Carolina Board of Transportation, and the Federal Highway Administration have been in the process of planning for the eventual construction, with federal financial assistance, of a segment of the Interstate System of Highways from the terminus of I-40 in the Research Triangle Park southeast of Durham, North Carolina to Interstate Highway 85 west of Durham;

(2) As a part of the planning process, the North Carolina Department of Transportation, with the Federal Highway Administration, has prepared and circulated for comment, in accordance with federal regulations, two draft Environmental Impact Statements, the most recent of which is dated 10 May 1976;

(3) Under federal highway regulations location approval is a precondition to federal authorization to the North Carolina

Department of Transportation to proceed with engineering design, and that design approval is in turn a precondition to federal authorization for a right-of-way acquisition;

(4) Consistent with federal regulations the North Carolina Department of Transportation and its predecessor agencies held two public hearings with respect to the location of the general corridor for the proposed segment of the Interstate Highway;

(5) Federal regulations provide that the draft environmental statement should indicate that all alternatives are under consideration and that a specific alternative will be selected by the state highway agency following a public hearing, that the final environmental impact statement will be prepared for the selected alternative, and, pursuant to these regulations, the North Carolina Department of Transportation has been revising the Draft Environmental Impact Statement to incorporate the comments received from circulation of the statement and the public hearings which have been held;

(6) Prior to the 9 September 1977 meeting of appellee North Carolina Board of Transportation, a copy of the Draft Environmental Impact Statement was furnished to each member of the Board and at the meeting a summary of the comments recorded at the Corridor Public Hearing along with copies of letters and resolutions expressing the views of local institutions and government agencies were handed out to members of the Board;

(7) At the meeting of 9 September 1977, after hearing the recommendations of Staff Administrator Rose, and a discussion of the alternatives by T. L. Waters, the Manager of the Planning and Research Branch, the Board approved the Alternate 1-B corridor location "subject to approval of the Environmental Impact Statement and subject to such modifications as may be necessary and appropriate in the final location and design of the project"; and

(8) Prior to the 9 September 1977 meeting appellants had ample opportunities to express their views to defendants regarding the highway in question and that many of the appellants have fully availed themselves of these opportunities.

On 27 February 1979 the Town of Chapel Hill gave Notice of voluntary dismissal in this action.

Plaintiffs now appeal from the 1 March 1979 order of the lower court dismissing each count of appellants' complaint pursuant to Rules 12(b)(1) and 12(b)(6), N.C. Rules Civ. Proc.

*Attorney General Edmisten by Special Deputy Attorney General James B. Richmond for defendant appellees.*

*Coleman, Bernholz & Dickerson by Roger B. Bernholz for plaintiff appellants.*

CLARK, Judge.

## I. QUESTIONS PRESENTED

This appeal raises numerous issues of first impression in this jurisdiction involving the interrelationship between North Carolina and federal legislation and regulations pertaining to highway construction, environmental law and administrative procedure. We regret that the determination of these issues has required so much time and that this opinion now requires so much space.

[1] It is the policy of this State and the Federal Government that environmental impacts be considered before major governmental actions involving the expenditure of public funds are taken. Nonetheless, once these environmental factors are properly taken into consideration, pursuant to prescribed procedures, governmental agencies may effect the completion of a proposed project, notwithstanding the fact that adverse environmental consequences may occur. In such cases, it is not for this Court to "substitute *its* judgment *for* that of the agency as to the environmental consequences of [the agency's] actions" for it is well established that a court "cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed. 2d 576, 590 (1976) at fn. 21. (Citations omitted.)

[2] A court may, however, review the manner in which an agency decision has been made to ensure that environmental consequences have been considered in the manner prescribed by law. Given the procedural context of this appeal, we do not answer the question of whether the Board of Transportation has in fact failed to comply with the prescribed procedures. Instead we only

answer the question of whether, assuming the facts pled by the appellants are true, appellants have asserted claims which are recognized under the law. The proof of facts to support any of the claims which are legally cognizable is a matter for further determination by the trial court.

We must first address the question of the extent to which the parties and issues are now properly before this Court. Only when this is done can we address the substantive questions as to whether the plaintiffs have stated a claim for which injunctive relief can be granted.

## II. JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT.

Appellants assert a right of judicial review under the North Carolina Administrative Procedure Act (NCAPA). G.S. 150A-43 of the NCAPA provides as follows:

> "*Right to judicial review.* — Any person who is aggrieved by a final agency decision in a contested case, and who has exhausted all administrative remedies made available to him by statute or agency rule, is entitled to judicial review of such decision under this Article, unless adequate procedure for judicial review is provided by some other statute, in which case the review shall be under such other statute. Nothing in this Chapter shall prevent any person from invoking any judicial remedy available to him under the law to test the validity of any administrative action not made reviewable under this Article." (1973, c. 1331, s. 1.)

Appellants' claims fall within three categories: (1) appellants' right to a hearing on the proposed highway location, including concomitant rights such as notice and convenient forum; (2) the adequacy of the environmental impact statement (EIS); and (3) the constitutionality of the legislative delegation of powers to the Board of Transportation. We must consider each of these claims individually in light of the capacity of this Court to review them under G.S. § 150A-43. We hold that appellants: (1) have a right under G.S. § 150A-43 to obtain judicial review of the "right to hearing" claim pursuant to the Board's administrative regulations; (2) cannot obtain judicial review under G.S. § 150A-43 of their claim pertaining to the adequacy of the environmental im-

pact statement unless it can be shown to the trial court that the North Carolina Department of Transportation has requested and received location approval for Alternate 1-B from the Federal Highway Administration; and, (3) cannot obtain, under G.S. § 150A-43, judicial review of the unconstitutional delegation claim but that said claim may be reviewed pursuant to Article IV, Section 1 of the North Carolina Constitution. This holding compels explanation of the four initial requirements of G.S. § 150A-43: (1) an "aggrieved" party; (2) a "final agency decision"; (3) a "contested case"; and, (4) "exhaustion" of administrative remedies. *See generally*, Daye, *North Carolina's New Administrative Procedure Act: An Interpretive Analysis*, 53 N.C.L. Rev. 833 (1975) (hereinafter "Daye.")

A. *Aggrieved Person.*

[3]   Before any person may seek review under G.S. § 150A-43 he must be "aggrieved." The NCAPA defines "person aggrieved" as "any person, firm, corporation, or group of persons of common interest who are directly or indirectly affected substantially in their person, property, or public office or employment by an agency decision." G.S. § 150A-2(6). In interpreting the Judicial Review Act (N.C. Gen. Stat. Ch. 143, Art. 33, repealed effective 1 February 1976), the predecessor to the NCAPA, our Supreme Court gave the following definition of "person aggrieved":

> "The expression 'person aggrieved' has no technical meaning. What it means depends on the circumstances involved. It has been variously defined: 'Adversely or injuriously affected; damnified, having a grievance, having suffered a loss or injury, or injured; also having cause for complaint. More specifically the word(s) may be employed meaning adversely affected in respect of legal rights, or suffering from an infringement or denial of legal rights.' "

*In re Halifax Paper Company, Inc.*, 259 N.C. 589, 595, 131 S.E. 2d 441, 446 (1963), (citations omitted).

Following these definitions, we hold that the plaintiffs are all "aggrieved" persons under the Administrative Procedure Act. The individual plaintiffs are property owners within the proposed corridor of the highway. The members of SHAPE are citizens and taxpayers who live in or near the proposed highway corridor.

Orange County is also "aggrieved" in that its tax base and planning jurisdiction would also be affected by the proposed highway.

In addition, the requirement that a person be aggrieved is quite similar to the concept of "standing," *Daye, supra*, at 901, and in this regard we hold that the appellants have " 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentations of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Stanley, Edwards, Henderson v. Department of Conservation and Development*, 284 N.C. 15, 28, 199 S.E. 2d 641, 650 (1973), [quoting from *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed. 2d 947, 961 (1968)].

Similarly, the individual plaintiffs have asserted their position as taxpayers. The courts have consistently ruled that a taxpayer has no standing to challenge questions of general public interest that affect all taxpayers equally. *Green v. Eure*, 27 N.C. App. 605, 608, 220 S.E. 2d 102, 105 (1975), *cert. denied*, 289 N.C. 297, 222 S.E. 2d 696 (1976). As we explained in *Texfi Industries, Inc. v. Fayetteville*, 44 N.C. App. 269, 270, 261 S.E. 2d 21, 23 (1979), this rule "does not apply where a taxpayer shows that the tax levied upon him is for an unconstitutional, illegal or unauthorized purpose, *Wynn v. Trustees*, 255 N.C. 594, 122 S.E. 2d 404 (1961), that the carrying out of all the challenged provisions 'will cause him to sustain personally, a direct and irreparable injury,' *Nicholson v. State Education Assistance Authority*, 275 N.C. 439, 448, 168 S.E. 2d 401, 406 (1969), or that he is a member of the class prejudiced by the operation of the statute, *Appeal of Martin*, 286 N.C. 66, 209 S.E. 2d 766 (1974)." Consequently, we hold that the plaintiffs as taxpayers are "aggrieved" persons within the meaning of G.S. § 150A-43. *See generally*, Annot. 11 A.L.R. Fed. 556 (1972); Annot. 17 A.L.R. Fed. 33 § 8 (1973).

[4] Finally, the "procedural injury" implicit in agency failure to prepare an environmental impact statement is itself a sufficient "injury in fact" to support standing as "aggrieved parties" under G.S. § 150A-43 as long as such injury is alleged by a plaintiff having "sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmen-

tal consequences the project may have." *City of Davis v. Coleman*, 521 F. 2d 661, 671 (1975). Based on their pleadings, the appellants in this case satisfy this "geographical nexus" requirement.

B. *Final Agency Decision.*

**[5]** Merely being "aggrieved" is not enough to sustain judicial review under the NCAPA; the party must also be aggrieved by a "final" agency "decision." Appellants' unconstitutional delegation claim is a challenge to the facial validity of G.S. 143B-350(f)(8) and since the claim involves no "decision" at all, G.S. 150A-43 does not apply to the claim. The claim may, however, be heard pursuant to Article IV, Section 1 of the North Carolina Constitution.

Appellants' hearing claim and their EIS claim do involve "agency decisions," but a question remains as to whether the agency decisions with respect to these claims are sufficiently "final" to allow judicial review. As aptly explained by Professor Daye, the finality requirement:

> ". . . is an implementation of a general policy against piecemeal judicial involvement in agency processes. This policy is designed to conserve judicial resources, avoid delay that would be occasioned by premature judicial intervention, and prevent judicial intervention when agency action has not 'crystalized' into a settled or 'ripe' controversy, but remains 'hypothetical, intermediate, provisional or preliminary.' "

*Daye, supra,* at 902. *See also,* 2 Am. Jur. 2d *Administrative Law* § 583 (1962).

In the instant case, the Board of Transportation adopted the staff's recommendation to utilize the Alternate 1-B corridor location "*subject to* the approval of the Environmental Impact Statement and subject to such modifications as may be necessary and appropriate in the *final* location and design of the project." (Emphasis supplied.) It is apparent from defendants' answer, that at the time the answer was filed, the highway in question was still in the stage of preliminary engineering and planning, *federal location approval had not been obtained,* right-of-way plans were incomplete, acquisition of right-of-way had not been authorized by any of the defendants or the Federal Highway Administration, and construction contracts had not been advertised for bids.

Whether this action was sufficiently "final" may vary with respect to the issue involved. We must, therefore, consider the hearing claim and the EIS claims separately. The resolution of both of these questions turns upon the relative timing of the action in the context of the elaborate state and federal scheme for planning and constructing federal-aid highways. Steps pertaining to environmental review are also by necessity included. We take the time to explain each of these tedious procedural steps because they also bear upon the question of whether appellants have stated a claim.

### 1. *Procedure Under North Carolina Law.*

We start with the requirements of the North Carolina Environmental Policy Act (NCEPA). G.S. 113A-1 through 113A-10 (1971). Section 3 of NCEPA sets forth the "Declaration of State environmental policy":

> "The General Assembly of North Carolina, recognizing the profound influence of man's activity on the natural environment, and desiring . . . to assure that an environment of high quality will be maintained for the health and well-being of all, declares that it shall be the continuing policy of the State of North Carolina to conserve and protect its natural resources and to create and maintain conditions under which man and nature can exist in productive harmony. Further, it shall be the policy of the State to seek, for all of its citizens, safe, healthful, productive and aesthetically pleasing surroundings; to attain the widest range of beneficial uses of the environment without degradation, risk to health or safety; and to preserve the important historic and cultural elements of our common inheritance."

To give effect to this policy, section 4 of the Act provides "that, to the fullest extent possible":

> "(2) Any State agency shall include in every recommendation or report on proposals for legislation and actions *involving expenditure of public moneys* for projects and programs *significantly* affecting the quality of the environment of this State, a detailed statement by the responsible official setting forth the following:

a. The environmental impact of the proposed action;

b. Any significant adverse environmental effects which cannot be avoided should the proposal be implemented;

c. Mitigation measures proposed to minimize the impact;

d. *Alternatives to the proposed action;*

e. The relationship between the short-term uses of the environment involved in the proposed action and the maintenance and enhancement of long-term productivity; and

f. Any irreversible and irretrievable environmental changes which would be involved in the proposed action should it be implemented.

*Prior to* making any detailed statement, the responsible official shall consult with and obtain the comments of any agency which has either jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such detailed statement and such comments shall be made available to the Governor, to such agency or agencies as he may designate, and to the appropriate multi-county regional agency as certified by the Director of the Department of Administration, shall be placed in the public file of the agency and shall accompany the proposal through the existing agency review processes. A copy of such detailed statement shall be made available to the public and to counties, municipalities, institutions and individuals, upon request." (Emphasis supplied.)

The NCEPA further provides that all "policies, regulations and public laws of this State should be interpreted and administered in accordance" with the Act, G.S. 113A-4(1), and that the "policies, obligations and provisions of this Article are supplementary to those set forth in existing authorizations of and statutory provisions applicable to State agencies and local governments." G.S. 113A-10. The NCEPA will be complied with,

however, where a State agency is required to file and does file an EIS pursuant to federal law. *Id.* Consequently, nothing in the NCEPA detracts from statutory obligations of any State agency "[t]o act, or refrain from acting *contingent upon* the recommendations or certification of any other State agency or federal agency." G.S. 113A-7(3). (Emphasis supplied.)

Pursuant to Section 4(3) of the NCEPA, the North Carolina Department of Administration has promulgated regulations which may be found in Title 1, Chapter 25 of the North Carolina Administrative Code. Section 25.0102 of these environmental regulations provides that any agency which "plans to utilize public moneys" supporting projects involving, *inter alia,* grading or land disturbing activities, must "file" an environmental impact statement (EIS). Such a filing can be accomplished pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C.A. § 4331 to § 4335, or the North Carolina Environmental Protection Act. Significantly, such a filing shall include preparation and dissemination of *both* a *draft* and a *final* EIS. 1 N.C.A.C. § 25.0102.

Sections 25.0206 and 25.0207 of the regulations provide that: "(a) *Prior to the release of any funds other than design funds,* an assessment of the potential environmental impact of the proposed action must be *completed.*" (Emphasis supplied.) To be completed, however, the following actions must be taken: (1) copies of the *draft* EIS must be sent to the State Clearinghouse maintained either by the Department of Administration or the Governor's office; (2) the Clearinghouse must solicit comments from interested parties and agencies, and such comments are to be submitted within 15 working days of the date the EIS is first submitted for public review; (3) the Clearinghouse must then prepare a summary of all the comments received on the draft EIS and submit the summary along with the comments to the lead agency (in this case the Department of Transportation); (4) the agency proposing the action then must "address," in the *final* EIS, the comments received on the draft EIS; and (5) copies of the final EIS must be filed with the Clearinghouse and be sent to all interested parties and agencies.

As to requirements pertaining to hearings under state law we must look at environmental and transportation statutes and

regulations separately. First, NCEPA has no language providing that any citizen has a right to be heard on a draft environmental impact statement. Similarly, the regulations issued pursuant to NCEPA, do not require that hearings must always be held on a proposed governmental action, even one significantly affecting the environment. Nonetheless, 1 N.C.A.C. § 25.0106 does provide that a public agency or private person who, *inter alia*, challenges the adequacy of the EIS or the lack of appropriate alterations thereunder, *may* petition the Governor or his designee, who, upon notification, *shall* appoint a hearing officer under the North Carolina Administrative Procedure Act to review the party's objections and to present recommendations to the Governor.

In contrast, the State transportation legislation, G.S. 136-62 (1979 Cum. Supp.), expressly provides that the "citizens of the State shall have the *right to present petitions* to the board of county commissioners, and through the board to the Department of Transportation, *concerning additions to the system* [see G.S. 136-45] and improvement of roads. The board of county commissioners shall receive such petitions, forwarding them on to the Board of Transportation with their recommendations." (Emphasis supplied.) No timetables are attached to this provision, and there is no allegation that the State failed to consider the appellants' petitions, if any did in fact exist.

The transportation statutes also provide that the Board of Transportation "*may*, from time to time, provide that one or more of its members or representatives shall hear any person or persons concerning transportation." G.S. 143B-350(a). Pursuant to this authority the Department of Transportation issued regulations, effective 1 February 1976, which provided as follows:

".0501 PERSONS SHALL BE HEARD

Any person having business with the Board of Transportation *shall* be heard by the Board.

*     *     *     *

.0502 AGENDA

The Chairman of the Board *shall* provide for an agenda position for such items of business.

*     *     *     *

.0503 PROCEDURE

The chairman *shall* prepare a procedure for the disposition of such business by the Board." (Emphasis supplied.)

19 N.C.A.C. § 2A .0501 to § 2A .0503. We can find no procedures which were ever published pursuant to 19 N.C.A.C. § 2A .0503. On 1 July 1978, after the 9 September 1977 action of the Board of Transportation, Title 19 of the N.C.A.C. was rewritten and former section 2A .0501 is now codified as 19A N.C.A.C. 1A .0302(1) and reads as follows:

".0302 FUNCTIONS, POWERS AND DUTIES; GENERAL

The Board of Transportation, as its general function:

(1) *may* hear any person or persons on any transportation matter; . . ."

(Emphasis added.)

In this case the State relies upon the amended language; the appellants, the former. It is the former language which was in effect at the time appellants sought to be heard and which is dispositive of this issue.

[6]   We now hold that the decision of the Board of Transportation to deny appellants a hearing before the Board on 9 September 1977 was a "final" decision within the meaning of G.S. § 150A-43. The decision affected a right which appellants had due to the agency's own regulations and which existed independent of both the state and federal scheme for constructing federal-aid highways and the state and federal scheme for review of environmental impact statements.

More analysis is needed, however, in order to determine the ripeness of appellants' environmental challenges.

2. *Procedure Under Federal Environmental and Transportation Laws.*

Were this a case in which only state highway funds were involved, an action to challenge the sufficiency of the environmental impact statement would be ripe when the Board of Transportation approved the location of the highway corridor following the preparation of a final environmental impact statement.

The proposed I-40 segment, however, is a project which requires federal aid and thus requires compliance with the federal environmental statutes and regulations. Technically speaking, these federal requirements are binding *only* on *federal* agencies. *City of Davis v. Coleman, supra.* Nonetheless, the North Carolina Board of Transportation would be acting within the *North Carolina* environmental protection act if it were complying with *either* the state or federal environmental regulations or procedural requirements, G.S. 113A-7(3); G.S. 113A-10; 1 N.C.A.C. § 25.0102, and to the extent that the federal environmental law is relied upon to meet the requirements of NCEPA, the federal requirements are by reference enforceable against North Carolina agencies as state law.

Nonetheless, even if, for the purposes of this litigation, the North Carolina Department of Transportation chose to rely upon compliance with the North Carolina Environmental Protection Act, it must as a practical matter of cooperation with the Federal Highway Administration, ultimately comply with the National Environmental Policy Act, 42 U.S.C.A. §§ 4331-4335, and the Federal Highway Act, 23 U.S.C.A. §§ 101-136, as well as the regulations promulgated pursuant to these authorities: 23 C.F.R. Part 771 (environmental impact and related statements); 23 C.F.R. Part 790 (public hearing and Location/Design Approval); and Part 795 (Process Guidelines for Development of Environmental Action Plans). For this reason, we must outline the federal scheme for planning and construction of federal-aid highways.

There are two modes of administrative procedures that may be utilized in federal-aid highway projects. The first, described in 23 C.F.R. Part 795, involves an "Action Plan" which is prepared by the State highway agency and which must be approved by the Federal Highway Administrator. Under the Action Plan a state highway agency may redefine the "stages" in the processing of a proposed highway project, but if not so redefined, the regulations provide for three different stages: (1) system planning stage; (2) location stage; and (3) design stage. 23 C.F.R. §§ 795.2(e), 795.12, 795.14(a). The Action Plan must, among other things, provide for review of alternatives, 23 C.F.R. §§ 795.9, 795.10(b)(1)(i) and environmental impacts. 23 C.F.R. §§ 795.3(a), 795.8, 795.10(b)(7)(iv). Under the Action Plan, the public must be able to "participate in an open exchange of views throughout the system planning, loca-

tion and design stage," 23 C.F.R. § 795.10(b)(3), and a *draft* environmental impact statement must be available for inspection and copying *before public hearings*. 23 C.F.R. § 795.10(7)(iv). Also, "*[d]ecisions* at the system and project stages shall be made with consideration of their social, economic, environmental and transportation effects to the extent possible at each stage." 23 C.F.R. § 795.13.

At the present time this Court has nothing before it from which it can ascertain that the proposed I-40 project was being administratively processed pursuant to an approved Action Plan; without such an Action Plan before us or knowledge of the absence of an Action Plan, we cannot, in the instant case, make a determination as to the finality of the Board's action, because we do not know the "stage" in the Action Plan at which the Board's action was taken. This is a question for further determination by the trial court.

If no Action Plan is involved, the state highway agency must nonetheless comply with the following procedures set out in 23 C.F.R. Part 790. 23 C.F.R. § 790.2(a). First, a "corridor public hearing" must be held (or an opportunity must be afforded for such hearing), 23 C.F.R. § 790.5, "*before* the route location is approved and *before* the State highway department is committed to a specific proposal." 23 C.F.R. § 790.3(a)(1). (Emphasis supplied.) If location approval is not requested within three years of the date of the last corridor hearing (such as might be true in the instant case), a new hearing must be held. 23 C.F.R. § 790.5(e). Notice of the hearing (meeting the requirements of 23 C.F.R. § 790.7(a) (3)-(15) ) must be published twice, once within 30 to 40 days of the hearing and once within 5 to 12 days of the hearing, in a newspaper of general circulation in the vicinity of the proposed undertaking. 23 C.F.R. § 790.7(a)(1). In addition, copies of the notice shall be sent to appropriate news media and planning agencies and to those who request to be on the State's mailing list. 23 C.F.R. § 790.7(a). The hearings must be conducted at a "*place and time generally convenient for persons affected by the proposed undertaking*," as set out in 23 C.F.R. § 790.7(b). (Emphasis supplied.) In particular, location alternatives and environmental effects of the alternate locations must be considered. 23 C.F.R. § 790.3(a)(3). Having conducted the corridor hearing and decided upon a corridor location, the State Highway Department must for-

mally request "location approval" from the Federal Highway Administration (FHWA), 23 C.F.R. § 790.7(b)(9) and at the same time publish a notice of the proposed location pursuant to 23 C.F.R. § 790.9(d). In order to obtain location approval the state highway agency must submit a transcript of the public hearing, 23 C.F.R. § 790.9(e)(iii), and a "location study report" which must include, among other things, a description of the alternatives to and the environmental effects of the project. 23 C.F.R. §§ 790.9(b), 790.8(b)(2).

Federal location approval will be given only after the *final* environmental impact statement has been completed, 23 C.F.R. § 771.5(b), and, regardless of whether or not the state highway agency is operating under an Action Plan, the FHWA must ensure compliance with the procedural and substantive requirements of 23 C.F.R. Part 771 pertaining to processing environmental impact statements. These regulations provide, *inter alia*, that no public hearing is required for the sole purpose of presenting and receiving comments on a draft EIS as long as the draft EIS is circulated so that the public and governmental agencies may express their views on the proposed action. 23 C.F.R. § 771.12(n). Nonetheless, the FHWA Division Administrator must approve the draft EIS before it is released for comment, 23 C.F.R. § 771.12(b) and when corridor location hearings are required (apparently always unless operating under an Action Plan, 23 C.F.R. § 790.5) the draft EIS shall be prepared prior to the public hearing. 23 C.F.R. § 771.5(c). Public review must then be allowed in compliance with the following comment and hearing notice timetables: (1) the draft EIS shall be circulated to the entities described in 23 C.F.R. §§ 771.12(h), 771.12(i), by the state highway agency on behalf of the FHWA for comment and shall be made available to the public at least 30 days before the public hearing and no later than the publication of the first notice for the hearing or opportunity therefor, 23 C.F.R. § 771.12(c); (2) private groups, individuals and governmental agencies which are furnished copies of the draft EIS by the state highway agency must be given a minimum of 45 days, as set out in the Federal Register, to review the statement and return comments, 23 C.F.R. §§ 771.12(f), 771.12(g); (3) for major actions such as the proposed project in the instant case, see 23 C.F.R. § 771.9(d)(1), (2), (5), the highway agency cannot proceed with the design (other than such

design work necessary to make engineering and environmental decisions) and right-of-way acquisitions (other than hardship cases), or construction until at least 90 days have elapsed since the *draft* EIS was circulated for comment and furnished to the Council on Environmental Quality. 23 C.F.R. § 771.5(e). In addition, actions contained in the draft EIS which involve, among other things, projects that involve natural, ecological, cultural, scenic, historic or park and recreation resources of national significance must be reviewed by the FHWA Washington Headquarters. 23 C.F.R. § 771.21(c).

The final EIS is to be prepared *only after* any required public hearings have been held, the alternatives in draft EIS have been considered, and the state highway agency has selected a specific alternative. *The final EIS will then be prepared for the specific alternative.* 23 C.F.R. § 771.18(j)(3). The final EIS shall include a copy and a summary of the comments received on the draft EIS. 23 C.F.R. § 771.18(o). Once completed, *the final EIS is then submitted to the FHWA Regional Office where it is reviewed for legal sufficiency and content.* 23 C.F.R. § 771.14(b). Where the proposed project involves, among other things, a new controlled access freeway or the opposition of a local governmental agency, the final EIS must be sent to the FHWA Washington Headquarters for prior approval. 23 C.F.R. § 771.14(c). The final EIS must then be distributed and made available for public review as presented in 23 C.F.R. § 771.14(d) to (h). Major design, construction or right-of-way acquisition activities may not begin until at least 30 days have elapsed since the final EIS has been sent to the Council on Environmental Quality. 23 C.F.R. § 771.5(e).

3. *Conclusion of the Finality Issue.*

[7] We have so far only explained the procedural requirements through the location stage of the project. These regulations put into effect the provision in the National Environmental Policy Act which requires that the environmental impact statement and the comments thereon "accompany the proposal through the existing agency review process." 42 U.S.C. § 4332(2)(c). Appellants' rights to enforce these federally prescribed procedures, however, are triggered only at the point in time at which the "final" statement is submitted and a recommendation or report on a proposal for federal action is made. *Aberdeen & Rockfish R. Co. v. SCRAP,*

422 U.S. 289, 320, 95 S.Ct. 2336, 2356, 45 L.Ed. 2d 191, 215 (1975). This is the point in time at which the project becomes a *federal* one, *City of Boston v. Volpe*, 464 F. 2d 254, 258-59 (1st Cir. 1972), and at which "an agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption." *Kleppe v. Sierra Club*, 427 U.S. 390, 406, 96 S.Ct. 2718, 2728-29, 49 L.Ed. 2d 576, 588 (1976) at n. 15. For federal-aid highway projects, this point in time is when federal location approval has been obtained. *City of Boston v. Volpe, supra; Indian Lookout Alliance v. Volpe*, 484 F. 2d 11, 16-17 (8th Cir. 1973); *National Wildlife Federation v. Snow*, 561 F. 2d 227, 234 (D.C. Cir. 1976).

Despite the statements in defendants' pleadings, dated 22 December 1978 that "Federal location approval has not been obtained" we do not know, given the procedural posture of this case, whether federal location approval had been made at the time of the proceeding below on 28 February 1979 or whether federal location approval has since been granted. If upon remand, the trial court should make a determination that federal location approval has not, at the time of the hearing upon remand been granted, then, because of lack of ripeness or finality, appellants may not assert any claims pertaining to notice, hearings, and review of the sufficiency of the EIS arising under the *federal* statutes and regulations. If the proposed I-40 project is being processed pursuant to an Action Plan, the trial court should look at the stages in the Action Plan to see if, consistent with this opinion, the federal action is sufficiently final to permit judicial review.

Similarly, appellants may not bring suit pertaining to a federal-aid highway project under the *North Carolina* Environmental Protection Act unless the Board of Transportation has formally requested and received location approval from the FHWA. At that point in the process a final environmental impact statement must have been prepared pursuant to NCEPA, and at that point the Board of Transportation's commitment to the Federal Government on the issue of location of the highway corridor is sufficiently final as to the issue of location to allow judicial review. Were we to hold otherwise in the context of a federal-aid highway project, we would invite staggered, piecemeal litigation of the same issues, under the state and federal environmental acts, in both state and federal courts. In addition, we

would invite judicial review of an EIS before federal authorities had reviewed the EIS to evaluate its legal sufficiency and content. In sum, this holding is consistent with NCEPA's provisions for coordinating state and federal efforts, G.S. § 113A-7(3) and § 113A-10, ensures that environmental matters are properly considered, and eliminates unnecessary delay due to premature involvement of the courts in the administrative process.

This result is also consistent with the rulings of this Court in *Davis v. North Carolina Department of Transportation*, 39 N.C. App. 190, 250 S.E. 2d 64 (1978), *cert. denied*, 296 N.C. 735, 254 S.E. 2d 177 (1979), and *Stevenson v. Department of Insurance*, 31 N.C. App. 299, 229 S.E. 2d 209 (1976), *cert. denied*, 291 N.C. 450, 230 S.E. 2d 767 (1977).

There is some question as to whether 1 N.C.A.C. § 25.0206(a), which provides that the final EIS need not be completed "prior to the release of any funds *other than design funds*," means, by implication, that an action under NCEPA pertaining to a federal-aid highway would not lie until both the "location" and "design" stages were completed. We do not, however, think that the word "design" in the North Carolina environmental regulations has the same technical meaning as "design" in the context of the elaborate federal highway regulations. Rather, we think that "design" in the NCEPA regulations means no more than "preliminary planning" or "preliminary project formulation" and we note that the act of obtaining federal location approval involves a commitment of time and resources sufficiently beyond the preliminary planning stage to make the question of the adequacy of the environmental impact statement ripe for determination. *See, e.g.*, 23 C.F.R. § 771.5(e).

Even though we must remand this case to the trial court to make a determination as to whether federal location approval or the equivalent under an Action Plan has been given, we will nonetheless proceed with this opinion under the assumption that location approval has been given.

C. *Contested Case.*

[8] The next prerequisite for judicial review under G.S. 150A-43 is that the final agency decision be made in a "contested case." G.S. 150A-2 defines "contested case" as follows:

"150A-2. *Definitions.*—As used in this Chapter.

* * * *

(2) 'Contested case' means any agency proceeding, by whatever name called, wherein the legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for an adjudicatory hearing. Contested cases include, but are not limited to proceedings involving rate-making, price-fixing and licensing. Contested cases shall not be deemed to include rule making, declaratory rulings, or the award or denial of a scholarship or grant."

Were this case one which did not involve the North Carolina Environmental Protection Act we would have no doubt that the highway location decision did *not* involve a "contested case." Generally speaking, the Board of Transportation does not hold adjudicatory proceedings. Its power and decision to locate a highway within a certain corridor are purely executive in nature. True, landowners will have property rights affected once a decision to locate a highway has been made; those rights, however, are not the subject of the Board's proceedings, but rather the subject of condemnation proceedings which follow. *Schloss v. Highway Commission*, 230 N.C. 489, 492, 53 S.E. 2d 517, 519 (1949).

Nonetheless, one statute may expand upon a right granted in another statute, and, where possible, it is the duty of the Appellate Courts to interpret statutes so as to be consistent with each other. Consequently, for four reasons we hold that this controversy involves a "contested case" within the meaning of G.S. 150A-43.

First, the North Carolina Environmental Protection Act provides the Governor with authority to develop plans and procedures to implement the Act. G.S. 113A-4(3). As discussed above, pursuant to this statutory authority a set of regulations was promulgated, including a regulation providing for an appeal of an agency environmental determination to a hearing officer appointed by the Governor "under the Administrative Procedure Act." 1 N.C.A.C. § 25.0106. In turn, Article 3 of the Ad-

ministrative Procedure Act provides for administrative hearings of "contested cases." G.S. 150A-23. Consequently, by broadening the type of controversy which may be heard under Article 3, the NCEPA and the regulations effectively broaden the definition of "contested case" and expand the scope of procedural remedies available under the Administrative Procedure Act, including the right to judicial review provided in G.S. 150A-43. This reasoning, we think, is consistent with G.S. 113A-4(1) and 113A-6 which require that the policies and procedures of all state agencies be made consistent with NCEPA.

Second, this result is consistent with the notion that the purpose of the Administrative Procedure Act is to provide only "basic minimum procedural requirements" which can be supplemented by other means. *See, e.g.*, G.S. 150A-9. As we have just explained, such supplementation has been provided by the North Carolina Environmental Policy Act and the regulations issued pursuant to this authority.

Third, the General Assembly has stated that the purpose and intent of the entire Administrative Procedure Act is to "establish as nearly as possible a uniform system of administrative procedures for State agencies." G.S. 150A-1(b). By broadly construing "contested case" in the context of environmental challenges to state action, we do in fact further a uniform system of administrative procedure and subsequent judicial review of administrative action. Consequently, we do not feel compelled to undertake a restrictive interpretation of "contested case" where there is an environmental challenge to State action under the North Carolina Environmental Policy Act.

Finally, the language in the North Carolina Administrative Procedure Act which provides that Articles 2 and 3 of the Act shall not apply to the Department of Transportation in rulemaking or administrative hearings only applies to actions taken by the Department pursuant to Chapter 20 of the General Statutes. Chapter 20 only refers to regulation of motor vehicles. In contrast, Chapter 136 and Chapter 143B provide the Department of Transportation and the Board of Transportation with their respective powers and duties to engage in the planning and construction of the state highway system. It is implicit, therefore, that had the General Assembly wanted to exclude actions of the

Department and Board of Transportation under Chapter 136 from the requirements of Articles 2 and 3 of the Administrative Procedure Act, the General Assembly would have done so with the same specificity that it excluded actions taken pursuant to Chapter 20.

D. *Exhaustion of Administrative Remedies.*

[9] The final major requirement of G.S. 150A-43 is that the aggrieved party exhaust "all administrative remedies made available to him by statute or agency rule." As explained above there are at least two administrative remedies under state law available to the appellants in the instant case. First, G.S. 136-62 (1979 Cum. Supp.) provides in relevant part that "[t]he citizens of the State shall have the right to present petitions to the board of county commissioners, and through the board to the Department of Transportation, concerning additions to the system and improvement of roads. The board of county commissioners shall receive such petitions, forwarding them on to the Board of Transportation with their recommendations." The "system," as used herein, refers to the "statewide system of hard-surfaced and other dependable highways" described in G.S. 136-45 (1979 Cum. Supp.) and would include the proposed segment of I-40. Since the appellants joined with Orange County to present their grievances to the Board of Transportation and, subsequently, to bring this lawsuit, we think that for all practical purposes they have complied with the substance if not the pure letter of the statutory right of petition found in G.S. 136-62.

[10] Appellants' second administrative remedy, as also discussed above, is their right to petition to the Governor for a hearing, as set forth in Title I, Chapter 25, Section .0106 of the North Carolina Administrative Code. The failure to exhaust such an administrative remedy, however, will not bar judicial review if that remedy has been shown to be inadequate. *See generally, Daye, supra,* at 904-08. In the instant case the administrative remedy prescribed by the environmental regulations is inadequate because the regulations were not published as required by the "Registration of State Administrative Rules Act," now codified as Article 5 of the Administrative Procedure Act. G.S. 150A-58 to -64. *See generally,* Bell, *Administrative Law: The Proposed North Carolina Statutes for Registration and Publication of State Ad-*

*ministrative Regulations*, 8 Wake Forest L. Rev. 309 (1972) (hereinafter "Bell"). G.S. 150A-63, in particular, provides that: (1) the Attorney General shall compile, index in a manner conforming to the organization of the General Statutes, and publish all rules filed and effective pursuant to Article 5 of the NCAPA; (2) that cumulative supplements are to be published at least annually; (3) that copies of the compilation, supplements and recompilations shall be distributed by the Attorney General to, among other persons and entities, each Justice of the Supreme Court, each Judge on the Court of Appeals, each district attorney, the Clerk of Superior Court or a county law library in each county, each federal district court operating in the state, the Fourth Circuit Court of Appeals and the United States Supreme Court.

We take judicial notice that: (1) the administrative regulations have not been published as required by G.S. 150A-63; (2) over 18,000 pages of regulations exist; (3) anyone seeking to find the regulations would have to go to the Administrative Law Division of the Attorney General's Office in Raleigh and sift through the files of regulations; (4) the regulations which have been officially codified are not indexed by the corresponding statutory reference; and, (5) the situation is such that even the most skilled and diligent attorney would at best have a random chance of discovering the existence or absence of the regulations for which he was looking. While it is generally said that ignorance of the law is no excuse for a failure to comply with the law, such a rule does not apply where the citizen is, as a matter of practicality, denied a reasonable means for finding out what the law is in the first place. Consequently, we hold that, *under the facts of this case*, it would contravene the most rudimentary principles of due process for this Court to deny the appellants a right of judicial review because they had not exhausted an administrative remedy codified in 1 N.C.A.C. § 25.0106 which is effectively hidden in the catacombs of the state bureaucracy.

### III. SOVEREIGN IMMUNITY

[11] The State argues that under the doctrine of sovereign immunity the exercise of discretionary powers by the Department of Transportation and its Board of Transportation in selecting the location of the route for an interstate highway is not subject to judicial review unless its action is so clearly unreasonable as to

amount to abuse of administrative discretion. We agree with this proposition. In fact, G.S. 136-59, set forth below, explicitly bars judicial review of the decision of the Board of Transportation to locate a highway in a certain place:

> "136-59. *No court action against Board of Transportation.* —No action shall be maintained by any of the courts of this State against the Board of Transportation to determine the location of any State highways or portion thereof, by any person, corporation, or municipal corporation."

In the instant case, however, appellants do not challenge the location of the proposed highway, but rather the alleged unlawful manner in which the decision was made. Consequently, appellants may seek review under two well-established exceptions to the doctrine of sovereign immunity, which would by necessity, also be exceptions to G.S. 136-59: (1) "When public officers whose duty it is to supervise and direct a State agency attempt to enforce an invalid ordinance or regulation, or invade or threaten to invade the personal or property rights of a citizen *in disregard of law*," *Schloss v. Highway Commission,* 230 N.C. 489, 492, 53 S.E. 2d 517 (1949); *Teer v. Jordan,* 232 N.C. 48, 59 S.E. 2d 359 (1950); *Lewis v. White,* 287 N.C. 625, 216 S.E. 2d 134 (1975); and, (2) where plaintiffs have asserted their status as taxpayers and are trying to prevent the expenditure of money unauthorized by statute or in disregard of law. *Lewis v. White, supra; Teer v. Jordan, supra.* Both of these exceptions apply in the instant case.

## IV. Appellants' Claims For Relief

We now address the question of whether appellants have stated a claim which would entitle them to the injunctive relief they seek. The well-known standard for evaluating the legal sufficiency of a claim for relief is whether the pleadings "[give] sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it, to file a responsive pleading, and—by using the rules provided for obtaining a pretrial discovery—to get any additional information he may need to prepare for trial." *Sutton v. Duke,* 277 N.C. 94, 104, 176 S.E. 2d 161, 167 (1970). In addition, the pleadings must state enough to satisfy the substantive elements of at least some legally recognized claim or defense, *Stan-*

*back v. Stanback*, 297 N.C. 181, 254 S.E. 2d 611 (1979). A claim should be dismissed under N.C. Rule Civ. Proc. 12(b)(6) where it appears that plaintiff is entitled to no relief under any statement of facts which could be proven. *Newton v. Standard Fire Insurance Company*, 291 N.C. 105, 229 S.E. 2d 297 (1976), and such will occur when there is want of law to support a claim of the sort made, an absence of facts sufficient to make a good claim, or the disclosure of some fact which will necessarily defeat the claim. *Federal Deposit Insurance Corporation v. Loft Apartments*, 39 N.C. App. 473, 250 S.E. 2d 693 (1979), *cert. denied* 297 N.C. 176, 254 S.E. 2d 39 (1979); *North Carolina National Bank v. McCarley & Company*, 34 N.C. App. 689, 239 S.E. 2d 583 (1977); *Hodges v. Wellons*, 9 N.C. App. 152, 175 S.E. 2d 690 (1970). We will apply these standards to each of the three bases for which appellants seek relief.

A. *Unlawful Delegation of Legislative Powers.*

[12] The appellants challenge the action of the Board of Transportation by asserting that the action was a delegation of legislative authority to an appointed administrative body which was unrestrained by legislative standards, sufficient procedural safeguards or political accountability in violation of Article I, Section 6 and Article II, Section 1 of the North Carolina Constitution. We do not agree with this assertion of the appellants and hold that the trial court's grant of appellees' motion to dismiss under N.C. Rule Civ. Proc. 12(b)(6) was proper as to this aspect of appellants' claim.

There are more than adequate standards established by the General Assembly to guide the decisions of the Board of Transportation and the actions of the Department of Transportation. G.S. 136-44.1 (1979 Cum. Supp.) provides that the Department of Transportation shall develop and maintain a statewide system of roads "commensurate with the needs of the State as a whole and it shall not sacrifice the general statewide interest to the purely local desires of any particular areas." G.S. 136-45 (1979 Cum. Supp.) states where and for what reasons a statewide system of roads is to be constructed and maintained:

"[A] statewide system of *hard-surfaced* and other *dependable* highways *running to* all county seats, and to all principal towns, State parks, and principal State institutions, and *link-*

*ing up* with state highways of adjoining states and with national highways into national forest reserves by *the most practical routes, with a special view of the development of agriculture, commercial, and natural resources* of the State, and for the further purpose of permitting the State to assume control of the State highways, repair, construct and reconstruct and maintain said highways *at the expense of the entire state,* and to relieve the counties and cities and towns of the State of this burden." (Emphasis supplied.)

G.S. 136-42.1 (1979 Cum. Supp.) further requires that the Department of Transportation "shall" consult with the Department of Cultural Resources "when objects of scientific or historical significance might be anticipated or encountered in a highway right-of-way" so that a determination can be made as "to the national, State, or local importance of preserving any or all fossil relics, artifacts, monuments or buildings."

Similarly, the Board of Transportation and Department of Transportation are both subject to the requirements of the North Carolina Environmental Policy Act which has already been discussed in detail. Independent of the North Carolina Environmental Protection Act, the Board of Transportation has the specific statutory duty to "*ascertain* the transportation *needs* and the *alternative means* to provide for these needs through an *integrated system* of transportation taking into consideration the *social, economic* and *environmental impacts* of the various alternatives." G.S. 143B-350(f)(3). (Emphasis supplied.) The Board of Transportation must also formulate policies "with due regard to farm-to-market roads and school bus routes." G.S. 136-44.1 (1979 Cum. Supp.).

Moreover, G.S. 136-44.4 (1979 Cum. Supp.) requires the Board of Transportation to approve an annual construction program, prepared by the Department of Transportation and made available to all members of the General Assembly. The plan shall include, *inter alia,* criteria for determining priorities of the projects as well as a statement of the immediate and long-range goals for all primary and urban system highways and for all federal-aid construction programs in the State.

In addition to the above-described standards, the provisions of G.S. 136-10 to 136-12 (1979 Cum. Supp.) insure that annual

reports of all of the projects, accounts, disbursements, liabilities, and expenses of the Department of Transportation are made to both the Governor and General Assembly—all of whom are politically accountable.

Consequently, we see no merit in this constitutional argument of the appellants. *N.C. Turnpike Authority v. Pine Island, Inc.*, 265 N.C. 109, 143 S.E. 2d 319 (1965).

B. *Right to a Hearing.*

[13]  We have already explained in great detail the hearing procedures prescribed in Parts 771, 790 and 795 of Title 23 of the Code of Federal Regulations. Any violation of these procedural requirements would constitute a legally cognizable claim for relief. In the instant case, assuming no Action Plan which alters these procedures is involved, plaintiffs have as a minimum asserted facts which might support the following claims for relief arising under *federal* regulations: (1) denial of a right to be heard (by the Board or other hearing officers) in the area affected by the highway construction project, 23 C.F.R. § 790.7(b); and, (2) inadequate public notice of the highway corridor meetings (whether held by the Board of Transportation or the Department of Transportation), 23 C.F.R. § 790.7(a). We are aware that the State's answer asserts the State's full compliance with these federal regulations, but given the procedural context of this case in which we are ruling on a Rule 12(b)(6) motion and not a Rule 12(c) motion for judgment on the pleadings, or a Rule 56 motion for summary judgment, we can only look at the plaintiffs' pleadings and we must leave the questions raised by defendants' answer for further determination by the trial court.

The appellants are correct in asserting that the Board of Transportation and the Department of Transportation are bound by their own regulations. *Humble Oil and Refining Company v. Board of Aldermen*, 284 N.C. 458, 202 S.E. 2d 129 (1974). As we have already explained, the regulations in effect on 9 September 1977 provided that "[a]ny person having business with the Board of Transportation *shall* be heard by the Board," 19 N.C.A.C. § 2A.0501, and since the Board apparently published no "procedure for the disposition of such business by the Board," 19 N.C.A.C. § 2A.0503 (effective between 1 February 1976 and 1

July 1978), appellants have stated a claim for which relief can be granted.

We note, however, that such a claim will not be cognizable for any claim arising after 1 July 1978 when the new regulations found in Title 19A of the North Carolina Administrative Code became effective. Furthermore, there are no state constitutional or statutory requirements which would require the Board of Transportation to hear any citizen on any particular transportation matter, *see, e.g.,* G.S. 143B-350(a), particularly since we have found that the Board is subject to adequate legislative standards, and since citizens have both the rights of participation provided in G.S. 136-62, *supra,* and 1 N.C.A.C. § 25.0106. While we believe that a formal procedure under State law allowing citizens to be heard by the Board of Transportation with respect to major highway actions would be desirable in the interest of democratic values and due process, that determination is one for the legislative and executive branches of our State Government.

We do note, however, that if appellants are to be entitled to an injunction, they must show not only that technical violations have occurred, but that they have been prejudiced by the violation. Appellants would not be entitled to an injunction, for example, if the State could show that appellants have in fact been heard by members of the Board at a public meeting at which the contested issues were discussed and that these comments were in fact presented to the remaining members of the Board. Appellants must bear in mind that injunctive relief has its roots in equity, that "equity regards substance rather than form" and that to this end "equity will not lend its aid to one whose sole ground for seeking its aid is based on a technicality." 30 C.J.S. *Equity* § 107 (1965).

C. *Environmental Impact Statement.*

[14] Appellants' first contention is that a *final* environmental impact statement had not been prepared prior to the Board of Transportation's decision on 9 September 1977. We have already explained that appellants' claim in the context of a federal-aid highway would not be ripe until federal location approval had been obtained. At that point the final environmental impact statement must have been prepared and evaluated by federal authorities. Consequently, unless federal location approval has

been obtained, this aspect of appellants' claim would be premature. Even if this claim were ripe, however, the federal transportation regulations explicitly require that the state highway agency select a highway corridor location based on the draft EIS so that a final EIS can be prepared for the selected location. 23 C.F.R. § 771.18(j)(3); the State authorities were therefore doing exactly what they were supposed to do. This aspect of appellants' environmental claim will not withstand a Rule 12(b)(6) motion. The result might be otherwise if this were not a federal-aid highway project.

[15] Appellants' complaint also contends that the environmental impact statement was inadequate and materially misleading in that it presented two alternative routes which were not real alternatives since the two highway routes were going to be built regardless of whether Alternative 1-B was built. We cannot say at this stage of the proceeding as a matter of law that appellants have not herein stated a claim. The primary purpose of both the state and federal environmental statutes is to ensure that government agencies seriously consider the environmental effects of each of the reasonable and realistic alternatives available to them. The standards for the content and adequacy of the EIS are articulated in 1 N.C.A.C. § 25.0201 and 23 C.F.R. § 771.18. The courts have subjected such standards to a "Rule of Reason" and have not required highway officials to consider every one of the "infinite variety" of "unexplored and undiscussed alternatives that inventive minds can suggest." *Fayetteville Area Chamber of Commerce v. Volpe*, 515 F. 2d 1021, 1027 (4th Cir. 1975), *cert. denied* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed. 2d 140 (1975). This Court, however, does not sit as a trier of fact. Nor does it have the contested environmental impact statement before it. Consequently, this is a matter for further determination by the trial court in the event that this question is shown to be ripe for determination.

If the environmental impact statement is not consistent with these standards, injunctive relief tailored to remedy any inadequacies or to require necessary hearings would be appropriate. *See, e.g., Environmental Defense Fund, Inc. v. Froehlke*, 477 F. 2d 1033 (8th Cir. 1973). A court may not justify a failure to issue an injunction based upon delay and concomitant cost increases alone; rather, the trial court must consider these factors in deciding whether interruption of a project in process would

severely prejudice the public interest. *See, e.g., Shiffler v. Schlesinger*, 548 F. 2d 96 (3d Cir., 1977); *Reserve Mining Company v. United States*, 498 F. 2d 1073, 1076-1077 (8th Cir.), *application for stay denied*, 419 U.S. 802, 95 S.Ct. 287, 42 L.Ed. 2d 33 (1974). The exercise of such discretion of the trial court will not be disturbed on appeal unless it can be shown that the trial court abused its discretion.

## V. SUIT AGAINST INDIVIDUAL DEFENDANTS

It was improper for the trial court to dismiss the claims for injunctive relief against the North Carolina Secretary of Transportation, the Manager of the Planning and Research Branch of the Department of Transportation, the Administrator of the Division of Highways, and the members of the Board of Transportation in their individual capacities. This holding requires more explanation.

The appellants seek two types of injunctive relief: (1) that the defendants be enjoined from taking any further steps toward the approval or construction of the proposed highway; and (2) that the Court issue a permanent injunction mandating defendants to rescind their approval of said Alternative 1-B pending full observance of their constitutional and statutory rights. In essence, appellants are asking for the court to require the public officials to recognize appellants' procedural rights before any further action on the highway project can be taken.

[16] The type of injunctive relief sought by appellants in this case is quite similar to that afforded by a writ of mandamus. The technical distinction between the two remedies is that the writ of mandamus will not ordinarily issue unless there has been an actual default of a clear legal duty, as distinguished from a threatened or anticipated omission to act, in which case injunction, and not mandamus, is the appropriate remedy. 52 Am. Jur. 2d *Mandamus* § 9 (1970). Also, the "mandatory injunction is distinguished from a *mandamus* in that the former is an equitable remedy operating upon a private person, while the latter is a legal writ to compel the performance of an official duty." *Ingle v. Stubbins*, 240 N.C. 382, 390, 82 S.E. 2d 388, 395 (1954) (citations omitted). When applied to actions against public officials in the context of modern jurisprudence, we find these distinctions to be "distinctions without a difference." First, neither a mandamus nor

an injunction is effective against the public office; rather, they both use the *in personam* contempt power of the court to coerce the individual public officer in the performance of a plain duty, 52 Am. Jur. 2d *Mandamus* § 8 (1970); 42 Am. Jur. 2d *Injunction* § 3 (1969), or to prevent the official from taking actions outside of his legal authority. We therefore can see little practical difference between issuing a writ of mandamus to require a public officer to act in accordance with or to carry out, for example, certain procedural requirements, and, enjoining an individual official who is purportedly acting under color of law from failing to comply with the same procedural requirements. *See*, for example, the majority and dissenting opinions in *Stafford v. Briggs*, 48 U.S.L.W. 4138 (1980) for dictum illuminating this elusive distinction in the context of the history of the federal Mandamus and Venue Act. Second, given the abolition of the distinction between actions at law and in equity under the modern rules of civil procedure, and the fact that in North Carolina there is a right to jury trial in actions arising at law and in equity, there is no justification for maintaining the distinction between the legal and equitable natures of the remedy. Even at common law the legal remedy of mandamus was adjudicated by reference to basic principles of equity. 52 Am. Jur. 2d *Mandamus* § 32 (1970). Indeed, Professor Dobbs in his distinguished treatise on remedies has suggested that today the writ of mandamus can be thought of merely as a special form of an injunction. Dobbs, *Remedies* § 2.10 at 112 (1973). *See also*, 42 Am. Jur. 2d *Injunctions* § 19 (1969). We therefore see no modern justification for the anachronistic rule that equity will not grant an injunction where there is an adequate remedy by mandamus, 42 Am. Jur. *Injunctions* § 43 (1969), and we see no merit in the State's contention that the question is moot merely because the relief sought is in the nature of a mandamus. In sum, regardless of which theory or legal fiction is used, the courts of this State have the power, pursuant to Article IV, Section 1 of the North Carolina Constitution, to issue *in personam* orders requiring public officials to act in compliance with their ministerial or non-discretionary public duties. In this regard, our Supreme Court in *Schloss v. Highway Commission, supra*, held that an injunction would not lie against the State Highway and Public Works Commission as an entity, but that plaintiffs therein could seek relief against the public officers who acted under assumed authority of the State. *See also, Lewis v. White, supra; Teer v. Jordan, supra.*

[17]  We now turn to the nature and scope of the judicial coercive action which can be taken against the individual public officers in this case. Traditionally, a writ of mandamus would not be issued to enforce a duty involving judgment and discretion. Each duty is viewed independently, and although a public officer may have many executive, administrative or discretionary duties, only those duties which are purely ministerial may be enforced by mandamus. 52 Am. Jur. 2d *Mandamus* § 81 (1970). In the instant case, the duty to decide where a highway corridor will be located is a discretionary duty against which a writ of mandamus will not be issued. Nonetheless, the duties to hear the appellants, the duties to provide notice, and the duties to prepare an environmental impact statement are ministerial duties which can be enforced by a writ of mandamus. The writ of mandamus, however, is effective as against each individual officer only as long as the officer remains in that public office, 52 Am. Jur. 2d *Mandamus* §§ 1, 8, 387 (1970) and in certain circumstances the mandamus may be effective as against a successor in office. 52 Am. Jur. 2d *Mandamus* §§ 85, 387 (1970). 63 Am. Jur. 2d *Public Officers* § 547 (1972). We see no reason for applying different standards to the injunctive relief as against public officials sought by appellants herein.

We therefore hold that (assuming appellants prove their case) the appellants' suit for injunctive relief will lie as against the respective named members of the Board of Transportation and the named officers of the Department of Transportation in their individual capacities as long as they remain in their official capacities and no longer. We note that we do not now address the more difficult question of suits against the public officials in their individual capacities for money damages.

## VI. CONCLUSION

The actions of the trial court in dismissing appellants' constitutional challenge (unlawful delegation of legislative powers) and in dismissing appellants' claim that no "final" environmental impact statement had been prepared at the time the Board of Transportation met on 9 September 1977, are affirmed.

The judgment of the trial court dismissing the remainder of appellants' claims against all defendants is reversed and remand-

ed to the trial court. Appellants' claim that they had a right, pursuant to the then-existing state regulations, to be heard by the Board of Transportation is ripe and constitutes a claim for injunctive relief, and injunctive relief would be appropriate if the appellants carry their burden of showing, in conformity with the usual standards for the issuance of an injunction, that this hearing right has been denied, that appellants have not waived this right, and that appellants have not in substance and as a matter of practicality had an opportunity to present their claims to the Board at other hearings pertaining to the proposed highway segment.

As to the claims pertaining to the adequacy or sufficiency of the environmental impact statement, this case is remanded to the trial court for a determination as to whether, at the time of the proceeding upon remand, federal location approval has been obtained, or if an Action Plan is involved, whether the stage of the planning and decision process is sufficiently "final" to warrant judicial intervention. If federal location approval has not been obtained, then these claims must be dismissed for want of ripeness. If federal location approval has been granted, then injunctive relief would be appropriate if appellants can carry their burden of showing: (1) that their hearing rights under the above-described federal transportation regulations have been infringed; or (2) that the final environmental impact statement (or the draft statement if the primary discussion of alternatives is in the draft and not the final statement) does not contain an adequate discussion of environmental impacts and alternatives to the proposed action (the construction of Alternate 1-B to connect I-40 with I-85 in Orange and Durham Counties).

Reversed and remanded.

Judges ARNOLD and ERWIN concur.